393 So.2d 691 (1981)
W. Frank EMERSON
v.
EMPIRE FIRE & MARINE INSURANCE COMPANY et al.
No. 80-C-1558.
Supreme Court of Louisiana.
January 26, 1981.
Andrew Jack Bennett, Bennett & McLaughlin, Baton Rouge, for plaintiff-applicant.
Stephen H. Vogt, H. Evans Scobee, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, for defendant-respondent.
BLANCHE, Justice.
On April 6, 1977, W. Frank Emerson was involved in a fiery traffic accident. Damaged, among other things, were two notebooks and a portfolio containing raw data *692 and notes compiled through experimental testing. The defendants were held liable for damages. Emerson was awarded $2,500 for the loss of the notebooks and portfolio. He appealed that determination to the First Circuit Court of Appeal, 387 So.2d 1238, which affirmed the award. We granted certiorari.
The sole issue presented by this case is the amount of damages due Emerson for the loss of the research data and notes.
Frank Emerson is a retired Army officer and a part time real estate salesman. In 1973, he became interested in the newly emerging field of biofeedback, particularly the subject of low frequency brain impulses called alpha waves. Working with his brother, Robert Emerson, a retired theoretical scientist, plaintiff began biofeedback research by conducting tests and experiments at his brother's well-equipped home laboratory.
The experiments were conducted on volunteer subjects with the aid of an electroencephalogram (EEG) machine, which plaintiff had been trained to operate by his brother. With this machine, plaintiff could get a physical representation of the brain activity of a person attached to the machine. By noting the wave pattern and the subject's personal history and characteristics (age, sex, occupation), the conditions of the test (whether the lights were on or off, or whether the person was sitting or standing, for example), the specific stimuli given in the specific test and the discipline of the person (Yoga, Zen Buddhism, Mind Control, for example), if any, he hoped to learn what effect certain factors would have on the production of alpha waves. With this information, he could test the validity of certain rituals and beliefs held by certain meditative disciplines as well as formulate his own hypotheses on the achievement of a state of relaxation. Plaintiff and his brother testified that plaintiff was well read in the pertinent literature and plaintiff testified that, as far as he knew, the objective evidence he was seeking was not available at the time.
By the time of the accident, plaintiff had logged in the destroyed notebooks the experimental conditions and brain wave response of participants in 1,763 individual tests. From these tests, he drew out 200 and wrote the case summary notes which were also destroyed. Because of this volume of testing done by plaintiff over the 4 year period, it was his intention to have computer analysis run on the data to facilitate the isolation of the significant variables that affect alpha wave production. Plaintiff testified that he had attempted to run such analysis by hand, but that it was too laborious. At the time of the accident, however, no computer analysis had been initiated.
Both lower courts correctly noted that the problem in assessing the damages due for the destruction of the notebooks is plaintiff's concession that he had no intention of reaping any material gain from his research. Rather, he hoped to satisfy his own intellectual curiosity and to share his information with others interested in the field. He was, in effect, a hobbyist interested in the pursuit of knowledge through science.
While it is readily conceded by all parties that the objective in assessing damages caused by tortious conduct is to place the plaintiff in the position he would have occupied had the injury complained of not been inflicted upon him, C.C. art. 2315, they differ as to the amount needed to satisfy that objective. Plaintiff contends that the sum necessary to place him in the status quo ante is approximately $77,000, the amount estimated by an expert to be necessary to have a paid research company reproduce 1763 EEG tests and 200 case histories using paid technicians and "volunteers". The defendants maintain that the intrinsic value of the data to plaintiff is controlling and not the cost of a mechanical production of similar data. They also maintain that the award allowed by the lower courts adequately reflected the value of the data to plaintiff.
It is axiomatic that when there is a legal right to recovery of damages but the *693 amount cannot be exactly estimated, the courts have reasonable discretion to assess them based upon all the facts and circumstances of the particular case. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971); Coleman v. Victor, 326 So.2d 344 (La.1976). When property damaged or destroyed has had an ascertainable market value, the courts have considered several factors to varying degrees. The Court in Ewell v. Petro Processors of La., Inc., 364 So.2d 604 (1st Cir. 1979), writ den., 366 So.2d 575 (La.1979), cited by the appellate court, catalogued a few such factors including the extent of the damage; the use to which the property may be put; the extent of economic loss in terms of (market) value and income; and the cost and practicability of restoration. See also Coleman v. Victor, supra, and cases cited therein. This analysis bogs down, to some extent, when the property destroyed, as is conceded to be the case here, has no market value.[1]
It does not follow from the lack of an ascertainable market value for destroyed property, however, that an innocent plaintiff must be turned out of court with only nominal damages, or none at all. To so hold would be contrary to the mandate of C.C. art. 2315 that one must repair damages occasioned by his fault. We note by way of example that quantification for pain and suffering is made every day in a court somewhere in this state and dollar amounts are assigned therefor even in cases requiring as much subjective judgment as that required in the case at bar.
The general rule of damages cited by courts for valuation of tortiously damaged property without market value is the actual or intrinsic value of the property to the owner.[2] While this is certainly a realistic and praiseworthy rule, it is not of much practical use for ascertaining a dollar amount. However, certain factors could be relevant to determine whether the rule is met by a particular award, including, but not limited to, the true nature of the loss; the costs of producing or acquiring the property in terms of reasonably spent time, effort and money; the present and potential future use of the item had it not been destroyed; and the cost and practicability of restoration.
Our review of the record indicates that Frank Emerson lost much more than a 6inch stack of paper contained in a portfolio and two notebooks. In effect, he lost the practical benefit of hobby material which took him over 4 years to develop. He lost the intellectual gratification that he received from the data as a part of the ongoing research project. He also lost the ability to draw from his research specific test results, which the record indicates he did when lecturing and participating in discussion groups. The data also had the potential for giving plaintiff future intellectual gratification, since the factor analysis plaintiff contemplated would have validated or invalidated his hypotheses and given plaintiff more information upon which he could have formulated new hypotheses.[3] In order to regain the enjoyment of the hobby of which he is now deprived, plaintiff will have to assemble the information anew.
The record reflects that the plaintiff quantified no cash outlay in producing the data in question. His brother owned the EEG machine which was used for conducting *694 the tests and the participants were volunteers. But using plaintiff's one-half hour approximation of the time spent actually conducting one test or writing one case summary, we find that the plaintiff proved that he expended about 1000 hours of time and effort compiling the destroyed information. We also noted that plaintiff expended some effort in procuring volunteers by attending biofeedback and parapsychology meetings held weekly at his brother's home between 1973 and 1976, but he offered no breakdown as to how much of that time was spent in actual recruitment as opposed to the acquisition of knowledge.
The testimony of plaintiff's expert is that the data could be reproduced by simply testing another 1,763 subjects. This is corroborated by the testimony of Robert Emerson, plaintiff's brother, who testified that the plaintiff continued after the accident to conduct research at the laboratory. He also testified that volunteers were being used in that research. Thus, the data can be practicably reproduced although presumably, different subjects would be used. The plaintiff proved that the data could be reproduced with the expenditure of 1000 hours of his time, or with the expenditure of $77,000, the amount estimated to be necessary for a paid research corporation to hire the required personnel to conduct and participate in the research.
In reviewing quantum awards, an appellate court can disturb an award made by the trial court only where the record indicates that the trier of fact abused its discretion in making the award. Upon finding an abuse of discretion, the award can only be raised (lowered) to the lowest (highest) point which is reasonably within the discretion of the trial court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977).
We find that the trial court abused its discretion in reaching the $2500 amount awarded by not considering factors relevant to a determination of the value of the notes to plaintiff. We disagree with plaintiff's contention, however, that the cost of reproducing this research using a paid research corporation is the only guide which must be utilized to determine the compensation due him. Under the facts of this case, the intrinsic value of the research to plaintiff in terms of intellectual gratification, when viewed in light of the time and effort spent compiling the research and the ease of reproduction at no monetary cost, is far less than the amount necessary to reproduce the research using a compensated research company. We find that the minimum amount which should have been awarded plaintiff in light of these factors is $7,500.
AMENDED AND RENDERED.
MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
Since plaintiff's research data and notes have no market value, I would allow no award for damages. Hence, I do not reach the issue of whether or not the trial judge abused his discretion in the award made. Accordingly, I respectfully dissent.
NOTES
[1] In general, market value is the price that would be agreed upon at a voluntary sale between a willing seller and willing purchaser under usual or ordinary circumstances. Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491 (1959); Princeville Canning Co. v. Hamilton, 159 So.2d 14 (La.App. 1st Cir. 1963); Henderson v. Dyer, 68 So.2d 623 (La.App. 1st Cir. 1953).
[2] This was the test cited by the appellate court in its opinion. See also Bishop v. East Ohio Gas Co., 143 Ohio St. 541, 56 N.E.2d 164 (1944); MacGregor v. Watts, 254 App.Div. 904, 5 N.Y.S.2d 525 (App.Div.N.Y.1938); Nashville Ry. & Light Co. v. Harrison, 5 Tenn.App. 22 (Tenn.1927); Southern Express Co. v. Owens, 146 Ala. 412, 41 So. 752 (1906); Louisville & Nashville Ry. Co. v. Stewart, 78 Miss. 600, 29 So. 394 (1901).
[3] C.C. art. 1934 provides for the payment of damages for breach of contract where the contract has for its object the gratification of some intellectual enjoyment.