514 So.2d 664 (1987)
TIDE CRAFT, INC., et al., Plaintiffs-Appellees,
v.
RED BALL OXYGEN CO., INC., et al., Defendants-Appellants.
No. 19015-CA.
Court of Appeal of Louisiana, Second Circuit.
October 28, 1987.
Writs Denied December 18, 1987.
*666 Campbell, Campbell & Johnson by James M. Johnson, Minden, for plaintiffs, First State Ins. Co. and Tide Craft, Inc.
Lunn, Irion, Johnson, Salley & Carlisle by James B. Gardner, Leon M. Pliner, Shreveport, for defendant, Red Ball Oxygen Co., Inc.
Mayer, Smith & Roberts by George T. Allen, Jr., Shreveport, for defendant, Foam Supplies, Inc.
Before HALL, JASPER E. JONES and SEXTON, JJ.
JASPER E. JONES, Judge.
In this action for property damages caused by fire the defendants appeal a judgment, pursuant to a jury verdict against them, for damages and attorney's fees totaling $664,017.14. The plaintiffs answer the appeal seeking an increase in attorney's fees. We reverse in part and amend and affirm in part.
The plaintiffs are Tide Craft, Inc., the owner of a boat manufacturing plant at Minden, Louisiana, and Tide Craft's property damage insurer, First State Insurance Company, which was subrogated to the claim of Tide Craft to the extent of its payment to Tide Craft on the fire loss. The defendants are Red Ball Oxygen Co., Inc., and Foam Supplies, Inc., both suppliers of materials used by Tide Craft in boat building.
The parties made six assignments of error[1] which raise the following issues:

*667 1. should defendants' motion for directed verdict have been granted;
2. were the defendants' products causes of the fire;
3. were the defendants' products defective;
4. did the jury award excessive damages; and
5. did the trial judge award inadequate attorney's fees.
The Facts
Tide Craft operated a boat manufacturing plant at Minden, Louisiana, in February, 1984. Tide Craft built recreational boats from fiberglass and also had a retail sales unit at its location.
One stage of the manufacturing process used by Tide Craft was the installation of foam flotation in its boats. This was done using the products supplied by defendants.
Foam Supplies supplied Tide Craft with a foam system which consisted of two large tanks and a foam gun. These tanks, which were referred to as the A side and the B side, contained the chemicals which were used to form the cellular urethane foam used for flotation.
The A side of the system used at Tide Craft contained approximately 3,100 pounds of chemicals and the B side contained approximately 2,900 pounds. The sides of the system were filled from large bulk tanks of material. Nineteen A sides and twenty-seven B sides were filled from the batches used to fill the foam system that was used at Tide Craft.
The foam system is designed to use nitrogen as the propellant for the foam. When the system is pressurized with nitrogen the operator may depress a button on the foam gun which causes material to flow from both tanks to the gun where it is mixed and forced out as foam. The foam, which resembles aerosol shaving cream as it emerges from the gun, expands to three times its original volume and hardens.
The B side tank contains a chemical residue of propylene oxide which is one of the chemicals which are combined to produce the B side ingredients. This residue comprises less than one percent of the chemicals in the system. The significance of the propylene oxide is that it is very volatile and flammable.
There was testimony from both Dr. H.K. Huckabay, plaintiffs' expert, and from Mr. David Keske, president of Foam Supplies, that propylene oxide in the foam system could react with oxygen. Mr. Keske testified that pressurizing the system with pure oxygen would result in an explosion. Dr. Huckabay testified that the reaction could occur with less than pure oxygen. Dr. Huckabay further explained that the oxidation reaction between propylene oxide and oxygen would result in a temperature rise and a pressure buildup so that the pressure relief valve on the B side tank would be activated spewing the contents into the air where it would burst into flames.
It appears that the danger of explosion or other chemical reactions which could result from the introduction of oxygen into the foam system was the reason Foam Supplies instructed its customers to use only dry nitrogen with the system. However, Foam Supplies did not warn of the dangers of using oxygen.
Tide Craft purchased the nitrogen cylinders it used with the system from Red Ball. The cylinder which was attached to the system at the time of the fire was purchased on February 7, 1984. Mr. Dennis Sneed, who operated the foam station on the day preceding the fire, testified that he believed he changed the nitrogen cylinder that day, February 9, 1984, though he also admitted some doubts as to his memory.
The cylinder had been filled by Red Ball at its plant in Shreveport. Empty cylinders returned to Red Ball are stored on the loading dock until they are to be filled. *668 Prior to commencement of the refilling process the cylinders are opened and allowed to vent to the atmosphere. The valves are cleaned and inspected while the cylinders are venting and the workers smell the contents to determine if they contain something other than odorless nitrogen. The tanks are struck with a hammer or other object so that the worker may determine, by the sound they make, whether they are empty or rusted. The cylinders are then moved to the filling manifold. The tanks are then connected to the manifold and subjected to a vacuum to remove all contents. The tanks are then filled with nitrogen and repainted or relabeled if needed.
The fittings at all stages of the nitrogen filling process, from bulk delivery through the filling manifold, are incompatible with oxygen fittings. This system prevents the possibility of a nitrogen cylinder being filled with oxygen. Dr. Huckabay testified that with Red Ball's operation "the possibility of placing oxygen in a nitrogen cylinder is essentially zero ..."
At trial the plaintiffs' expert testified that a nitrogen cylinder could become contaminated with oxygen if it were not vented and vacuumed. Dr. Huckabay explained that if a cylinder were attached to the filling manifold with its valve closed and that error was not discovered until after the vacuum had been placed on the system and the filling process begun and the valve were opened at that point, then that tank would be filled without being vacuumed and its contents would be contaminated with whatever residual air (oxygen) that was in it when the valve was opened.
It was conceded by Dr. Huckabay that an error of this type was not likely. However, he further testified that if there had only been nitrogen in the cylinder then the fire could not have commenced in the foam process area as described by the eyewitnesses.
The fire began at approximately 2:00 a.m. on February 10, 1984, after the workers had left at about 4:00 p.m. at the end of the work day on February 9, 1984. The origin of the fire was traced to the area in which the foam tanks were located at the northeast corner of the production building, by both Dr. Huckabay and by T.C. Bloxom, Minden Fire Chief.
Eyewitnesses, Mr. Frank Loftin, a Tide Craft employee who arrived shortly after the fire began, and Mr. Melvin Smith, president of Tide Craft who arrived shortly after the fire began, both testified that the fire was only in the foam area initially. This testimony is supported by that of Mr. Reed Addy, the nightwatchman who first observed the fire, though he was obviously not as familiar with the function of each area of the plant as the other witnesses.
The fire burned out of control for some time and eventually destroyed the entire production building.
Issue # 1Directed Verdict
The defendants contend that the trial judge should have granted their motion for directed verdict. We disagree.
The trial judge has much discretion in deciding whether a motion for directed verdict should be granted. Broussard v. Missouri Pac. R. Co., 376 So.2d 532 (La.App. 3d Cir.1979).
A motion for directed verdict is appropriately granted where, after considering all evidentiary inferences in the light most favorable to the party opposed to the motion, it is clear that the facts and inferences redound so overwhelmingly in favor of granting the verdict that reasonable jurors could not arrive at a contrary conclusion. Moore v. Aetna Cas. & Sur. Co., 454 So.2d 1273 (La.App. 2d Cir.1984). Cf. Campbell v. Mouton, 373 So.2d 237 (La.App. 3d Cir. 1979).
In this matter plaintiffs presented substantial evidence in the form of eyewitness testimony that the fire began in the foam area. They also presented expert testimony by Dr. Huckabay that there was no explanation for the fire consistent with the eyewitness testimony except that the fire resulted from defects in defendants' products.
The evidence presented by the plaintiffs was strong enough that the trial judge did not abuse his discretion in concluding that *669 reasonable jurors could have found for plaintiffs and based upon this determination denying defendants' motion for directed verdict.
Issue # 2Causation
The defendants argue the jury erred in finding their products to be causes of the fire. They argue instead that the fire resulted from the self-ignition of resin at one of the "chopper gun" stations. This contention is based on the following facts.
The evidence shows that flammable resins and catalysts are used at three stations along the Tide Craft production line. These are the gel coat station where the gel coat which forms the exterior of the hull is placed in the mold and the two "chopper gun" stations where fiberglass is sprayed into the mold. While the record does not reflect the distance between these locations and the foam stations, the record clearly reflects the boat has passed through these locations on the assembly line before it reaches the foam location in the northeast corner of the building.
The evidence reflects that the "chopper gun" stations produce a substantial amount of overspray which gets on the floor and light fixtures. The testimony shows that the material used at these stations can become hot and actually ignite if it is handled improperly after being catalyzed or if it is catalyzed improperly.
The defendants' expert witness Dr. Archie Broodo opined that this fire began from overspray which had not yet been cleaned up at a "chopper gun" station. He also opined that acetone cleaning fluid or MEK peroxide, both of which were also used at the "chopper gun" stations, could have caused the explosions heard by witnesses.[2]
However, on cross-examination Dr. Broodo admitted that his theory of the fire was inconsistent with the testimony of Mr. Loftin as to the site where the fire started and that he and Mr. Loftin could not both be right. As Dr. Broodo's theory of how the fire started is contradicted by the testimony of eyewitnesses Mr. Loftin, Mr. Addy and Mr. Melvin Smith, we must conclude, as the jury apparently did, that his theory is incorrect.
The plaintiffs' theory of the cause of the fire was that it began inside the foam tank and was caused by a reaction between oxygen in the nitrogen cylinder and propylene oxide in the B side tank or by contaminants in the foam. This theory was advanced by the plaintiffs' expert Dr. Huckabay who testified that there were no other explanations for the fire consistent with the observations of the witnesses.
Dr. Huckabay's theory of contamination in the foam was defeated by his admission that if no other users of foam which came from the same batch of foam as the foam being used by Tide Craft at the time of the fire had experienced problems with the foam which they received, then more probably than not there was no defect in the foam being used by Tide Craft at the time of the fire. Foam Supplies established through the testimony of Mr. Keske that no problems were experienced by other customers who purchased tanks of foam from it filled from the same batch as was contained in the Tide Craft tank in use at the time of the fire.
This leaves as the only explanation for the fire consistent with the observations of the witnesses a reaction between propylene oxide in the B side tank and oxygen in the nitrogen cylinder.
Red Ball has argued strenuously that there could not have been any oxygen in their nitrogen cylinder because of their procedures and the training of those who fill nitrogen cylinders. The problem with this argument is that it overlooks the evidence presented by plaintiffs that there had to be both propylene oxide and oxygen for the fire to occur.
The plaintiffs showed a way that oxygen could contaminate a nitrogen tank and that the fire could not have occurred without such contamination. From these facts the *670 jury could reasonably conclude, as it apparently did, that the nitrogen cylinder was contaminated with oxygen despite Red Ball's impressive safety procedures.
Causation is a question of fact. DuBois v. State Through Dept. of Pub. Safety, 466 So.2d 1381 (La.App. 3d Cir. 1985).
Questions of fact are generally left to the jury and its findings should not be disturbed unless clearly wrong. Vallery v. All American Life Ins. Co., 429 So.2d 513 (La.App. 3d Cir.1983), writ granted in part, 434 So.2d 1100 (La.1983).
We interpret the jury's answers to the interrogatories to it to be findings that the fire was caused by the presence of oxygen in the nitrogen cylinder and propylene oxide in the B side tank of the foam system. This finding is supported by the record.[3]
Issue # 3Defects
The defendants contend that the jury erred in finding their products defective. We find this contention to be correct with respect to Foam Supplies.
The issues with respect to defects may be further defined as follows: first, was Red Ball's cylinder of nitrogen defective because it contained oxygen and, second, was Foam Supplies' foam system defective because the B side tank contained propylene oxide?
A product is defective when it is unreasonably dangerous to normal use. Weber v. Fidelity & Casualty Insurance. Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971).
Unreasonably dangerous means simply that the article was dangerous to an extent beyond that which would be contemplated by an ordinary consumer. DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981).
Normal use encompasses all intended and forseeable uses, including reasonably forseeable misuse. Marshall v. Beno Truck Equipment, Inc., 481 So.2d 1022 (La.App. 1st Cir.1985), writ den., 482 So.2d 620 (La.1986); Benoit v. Ryan Chevrolet, 428 So.2d 489 (La.App. 2d Cir.1982).
We have no problem finding the nitrogen cylinder sold by Red Ball to be defective. The nitrogen was in normal, intended use and Red Ball was aware of that use. That the nitrogen was unreasonably dangerous due to oxygen contamination is shown by the consequences of its use here. No user of this product would anticipate that the use of this product in the normal, intended way would produce a chemical reaction and fire. Indeed, the user would expect the contrary, that the product would not produce unexpected chemical reactions.
The nitrogen sold by Red Ball to Tide Craft was defective and extremely dangerous to normal use due to its contamination with oxygen.
We now turn to the questions of whether the foam system was defective due to the presence of propylene oxide in the B side tank. We first consider the nature of propylene oxide.
The record establishes that propylene oxide is a very volatile and flammable chemical. Dr. Huckabay testified that propylene oxide is among the most flammable substances known. Mr. Keske admitted that propylene oxide is highly flammable. Dr. Broodo stated that propylene oxide has a very low flash point.
Dr. Broodo explained that the manufacture of the polyol ether component of the foam is accomplished by combining propylene oxide with water and sugar and heating the mixture. He further explained that the propylene oxide reacts with both the water and sugar molecules. Dr. Broodo also explained that after the reaction some part of the initial chemical ingredients would remain and that for this reason the material would be subjected to a vacuum to recover excess propylene oxide for further use and to insure that the polyol ether *671 material could be shipped under less stringent regulations than more volatile materials.
Mr. Keske testified that the supplier of the polyol to his company has a standard of less than 5/100ths of one percent for volatiles including propylene oxide. Mr. Keske told Dr. Huckabay fairly shortly after the accident that propylene oxide is present in the foam system. It appears that the propylene oxide in the foam system is only the residue from the manufacturing process of the foam ingredients.
The evidence shows that this propylene oxide residue makes the system extremely dangerous when used with oxygen. Mr. Keske stated that he would expect a "big boom" if the system were used with pure oxygen. While the danger of using this system with oxygen contaminated nitrogen might be known to some very sophisticated users we are convinced that the system when used with oxygen contaminated nitrogen is far more dangerous than would be expected by an ordinary consumer.
Under these circumstances the remaining inquiry is whether the use of the system with oxygen contaminated nitrogen was a normal use. We begin by finding that this was not an intended use of the foam system. The foam system's intended use was with dry nitrogen as the propellant. Therefore, we must focus our inquiry on whether this use with oxygen contaminated nitrogen is a forseeable misuse of the foam system.
The evidence presented by Red Ball of the mechanical safeguards in the gas distribution industry and in its own procedural safeguards to avoid inadvertently filling a cylinder with wrong gas or contaminating a cylinder with a mixture of gases is very impressive. We are convinced that mishaps of this sort are extremely rare. We find them so unlikely as to render their occurrence unforseeable by Foam Supplies. It was not forseeable that the foam system would be misused in this manner. For this reason we must hold that the accident here did not occur during the normal use of the foam system. Though the foam system is obviously extremely dangerous when used with contaminated nitrogen the foam system is not rendered defective by reason of this danger because it does not occur in normal use.
For these reasons the jury's finding of liability and the judgment against defendant Foam Supplies must be reversed.
Issue # 4Damages
The defendants argue that the jury award of $211,223.40 to Tide Craft is excessive by $191,022.40. Defendants do not dispute the jury's award of $433,721.86 to First State but they argue that Tide Craft should not be allowed to recover any items except its $1,000.00 deductible and a $19,201.00 co-insurance penalty which were not paid by First State. Tide Craft argues that the award in its favor is fair and equitable and supported by the evidence.
Defendants argue that the jury's award included recovery for $77,972.40 in depreciation, $1,450.00 for the difference in the high and low building estimates, $6,600.00 for a duplication error concerning boat dollies and $5,000.00 for salvage which was retained by Tide Craft. The defendants base this argument on a comparison of the amount awarded by the jury to the allegations of plaintiffs' petition concerning damages. Based on this comparison they argue that the jury allowed all of the abovementioned items plus the deductible and co-insurance penalty together with $100,000.00 for all other damages. The defendants also contend that there is not adequate proof to establish any other damages.
The defendants' theory of how the jury arrived at the amount of damages to allow to Tide Craft is interesting; however, its accuracy is unknown. It does not provide a basis for our review of the award. Instead, we review the award with an eye to whether the totality of the evidence adequately supports the amount of this lump sum award.
Tide Craft claimed damages of $50,000.00 for the loss of equipment including molds, templates and gauges. These items could be used only to manufacture Tide *672 Craft boats, therefore, they had no value to any other user; they had no market value.
Damages for property without market value are determined by actual or intrinsic value of the property to the owner in light of the true nature of the loss, the cost of producing the property, the present and future use of the property and the cost of restoration. Emerson v. Empire Fire & Marine Ins. Co., 393 So.2d 691 (La.1981).
Where there is a legal right to recover but the damages cannot be exactly estimated, courts have reasonable discretion to assess damages based upon all the facts and circumstances of the case. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971).
Tide Craft presented evidence the templates were used to properly position the holes drilled in the boats for installation of hardware and fittings. These items were made by Tide Craft through a process of trial and error. About twelve different templates were used on each bass boat model and Tide Craft had at least twelve models in production at the time of the fire.
There is little evidence about the cost of reproducing these items. This is understandable as they were made in-house by Tide Craft. However, these items were obviously of substantial value to Tide Craft.
Tide Craft also claimed damages for the costs of moving and reestablishing production. Tide Craft's comptroller, Mr. Charles Drake, testified that it spent $33,000.21 in payroll to its employees to move and reestablish production. This expense was not seriously challenged by defendants in their cross-examination of Mr. Drake. This item was properly claimed by Tide Craft as damages and no doubt considered by the jury in the totality of its award to Tide Craft.
Tide Craft also claimed the cost of demolishing the destroyed building as an item of damages. Mr. Drake testified that Tide Craft received a "quote" of $12,500.00 to do this work. He further testified that Tide Craft believed it could do this work cheaper and that it performed this work with its own employees. Mr. Drake estimated the cost of this work to Tide Craft at $10,000.00 though he admittedly had no detailed records of the expenses of this work. Mr. Drake further testified that Tide Craft was not paid for this item by First State.
Tide Craft also claimed damages for lost profits. This claim was supported by the testimony of Mr. John McDaniel, Tide Craft's certified public accountant. Mr. McDaniel testified that Tide Craft had net profits in the following amounts for the following years: 1982$78,810.59; 1983 $87,968.67; 1984$383,150.61. Mr. McDaniel explained that the 1984 net profit included large amounts of profit derived from the receipt of insurance payments for depreciated assets. Mr. McDaniel further explained that Tide Craft's net profit for 1984 excluding the accounting effect of the fire was only $15,944.70. Mr. McDaniel's testimony was fully supported by Tide Craft's federal income tax returns which were also placed in evidence. Tide Craft presented additional uncontradicted testimony from Mr. Melvin Smith that 1984 was a very good business year in the boating industry.
Damages for lost profits must be proved with reasonable certainty and will not be allowed where purely conjectural. Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081 (La.1983).
Tide Craft presented evidence to prove its loss of profits with reasonable certainty. Tide Craft proved with testimony and corroborating documentary evidence that it had been profitable in the two years preceding the fire. It further proved that 1984 was a favorable year for the boating industry. These facts strongly support a finding that Tide Craft would have made a substantially larger profit from operations in 1984 except for the fire.
The evidence on the abovementioned items of damages adequately supports the amount awarded by the jury. Tide Craft proved its damages and the jury did not abuse its discretion in fixing them in the amount of $211,223.40.
*673 Tide Craft proved special damages for demolition and moving and reestablishing production totalling $43,000.21. Defendants concede it is entitled to its deductible and co-insurance penalty which total $20,201.00. These items total $63,201.21 in special damages to which plaintiff was entitled.
These proven special damages, when compared to the total award, persuade us that the jury did not abuse its great discretion in fixing lost profits, Reck v. Stevens, 373 So.2d 498 (La.1979), or act unreasonably in fixing the actual value to Tide Craft of the destroyed equipment which had no fair market value, Emerson, supra.
Issue # 5Attorney's Fees
The trial judge fixed attorney's fees in this matter at a post-trial hearing. This procedure was used by agreement of the parties. The trial judge fixed attorney's fees in the amount of $19,071.88 allocating $12,778.15 of this amount to First State and $6,293.70 to Tide Craft.
The plaintiffs answered this appeal seeking an increase in the award of attorney's fees. Plaintiffs contend that the attorney's fee award should be increased to one-third of their damage award. The basis for this contention is that the award is inadequate, particularly in light of the one-third contingent fee actually incurred by the plaintiffs.
The proceedings at the hearing to determine attorney's fees are not in the record before us and, therefore, not available for our review. The briefs of the litigants establish the trial judge determined the attorney's fee award by multiplying plaintiffs' attorney's usual hourly fee times the number of hours plaintiffs' attorneys had worked on the case as evidenced by their time sheets which were placed in evidence at the hearing held for the purpose of determining the amount of the attorney fee award.
The trial court has wide discretion in assessing attorney's fees and it is not bound by the party's contract with its counsel. Verbick v. R.G.C. Investments, Inc., 477 So.2d 858 (La.App. 5th Cir.1985). The record before us discloses no abuse of discretion by the trial court in fixing attorney's fees. Cf. Philippe v. Browning Arms Co., 395 So.2d 310 (La.1981) (Attorney's fee award of $25,000.00 not inadequate where judgment was for $800,000.00).
However, the plaintiffs are entitled to an increase in the award to compensate for their attorney's work on this appeal. The record in this matter is voluminous and plaintiffs' counsel has filed a lengthy brief and he orally argued this case. To compensate these services we increase the award of attorney's fees by $6,000.00 and allocate $4,000.00 of this amount to First State and $2,000.00 to Tide Craft.
In First State's answer to the appeal it points out the interest on its attorney fee award from date of judicial demand was incorrect and the interest on this award should be ordered only from November 18, 1986, which was the date the trial court fixed the amount of the fee. We agree this change should be made. See Alexander v. Burroughs Corp., 359 So.2d 607 (La.1978).
The judgment against Foam Supplies, Inc., is reversed and the judgment against Red Ball Oxygen Company, Inc., is amended to increase the award of attorney's fees by $6,000.00, $4,000.00 to First State Insurance Company and $2,000.00 to Tide Craft, Inc. We award interest on the attorney fee increase to commence on the date of our judgment.
We recast the judgment to reflect the changes herein set forth in the following manner: The second, third and fourth paragraph of the judgment are recast to read as follows and a new paragraph awarding attorney's fees on appeal is inserted after the fourth paragraph, to-wit:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, First State Insurance Company, and against the defendant, Red Ball Oxygen Company, Inc., for the full sum of Four Hundred Thirty-Three Thousand Seven *674 Hundred Twenty-One and 86/100 ($433,721.86) Dollars, together with legal interest from date of judicial demand until paid and for all costs of these proceedings including certain court costs which are set forth hereinafter.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the plaintiff, Tide Craft, Inc., and against the defendant, Red Ball Oxygen Company, Inc., for the full sum of Two Hundred Eleven Thousand Two Hundred Twenty-Three and 40/100 ($211,223.40) Dollars, together with legal interest thereon from date of judicial demand until paid and for all costs of court including those certain costs of court set forth hereinafter.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiffs, First State Insurance Company and Tide Craft, Inc., and against the defendant, Red Ball Oxygen Company, Inc., awarding attorney's fees in the amount of Eighteen Thousand Three Hundred Fifty-Seven and 00/100 ($18,357.00) Dollars and expenses of their undersigned attorneys in the amount of Seven Hundred Fourteen and 88/100 ($714.88) Dollars, or a total of Nineteen Thousand Seventy-One and 88/100 ($19,071.88) Dollars, against Red Ball Oxygen Company, Inc. The foregoing award of attorney's fees shall be prorated between First State Insurance Company and Tide Craft, Inc., in accordance with the proportion that each of these plaintiffs received with respect to the total amount awarded by the jury, for an award to First State Insurance Company in the amount of Twelve Thousand Seven Hundred Seventy-Eight and 15/100 ($12,778.15) Dollars, together with legal interest thereon from November 18, 1986 until paid, and to Tide Craft, Inc., in the amount of Six Thousand Two Hundred Ninty-Three and 70/100 ($6,293.70) Dollars, together with legal interest thereon from November 18, 1986, until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of First State Insurance Company and against Red Ball Oxygen Company, Inc. in the amount of Four Thousand and 00/100 ($4,000.00) Dollars for attorney fees on appeal with interest thereon from the date the Court of Appeal judgment and that there be judgment herein in favor of Tide Craft, Inc. and against Red Ball Oxygen Company, Inc. in the amount of Two Thousand and 00/100 ($2,000.00) Dollars for attorney fees on appeal with interest thereon from the date of the Court of Appeal judgment.
AS AMENDED the judgment is AFFIRMED with all costs on appeal assessed against Red Ball Oxygen Company, Inc.
HALL, C.J., concurs in part and dissents in part and assigns written reasons.
HALL, Chief Judge, concurring in part and dissenting in part.
I agree with the majority opinion on the issues of liability and amount of damages. This partial dissent is written to express my view that the amount of attorney fees awarded should be increased. The transcript of the hearing on the rule to fix attorney fees is not in the appellate record. However, according to the briefs of counsel for both sides, the $18,357 award for attorney fees was fixed based on the amount of hours expended by plaintiff's counsel multiplied by his usual hourly rate. In my opinion, the award does not give adequate weight to the factors of the amount involved and result obtained, and particularly that the matter was handled on a one-third contingent fee contract. See and compare Lafleur v. John Deere Co., 491 So.2d 624 (La.1986); Pillow v. Board of Commissioners, 425 So.2d 1267 (La.App. 2d Cir. 1982), writ denied 445 So.2d 1225 (La.1984); Mini-Togs Products, Inc. v. Wallace, 513 So.2d 867 (La.App. 2d Cir.1987); DR 2-106(B).
I would increase the fee to the lowest reasonable amount which, under the circumstances, I believe to be $50,000.
NOTES
[1] The defendants made the following joint assignments of error:

1. The denial of their motion for directed verdict by the trial judge;
2. The jury's finding that their products were defective;
3. The jury's finding that their products caused the fire; and
4. The jury's award of excessive damages.
Foam Supplies also assigns as error the jury's finding that its product was defective and a cause of the fire even accepting plaintiffs' theory of the case.
The plaintiffs assign as error the trial judge's award of inadequate attorney's fees. (By stipulation the attorney's fees were fixed by the trial judge in a post-trial hearing).
[2] Dr. Huckabay opined that the noise heard by the witnesses could have been the venting of the relief valve on the foam system.
[3] Any finding that contamination in the foam was a cause of the fire would be clearly wrong in light of the testimony of Dr. Huckabay and Mr. Keske.