854 So.2d 880 (2003)
NATIONAL UNION FIRE INSURANCE COMPANY OF LOUISIANA
v.
Burt HARRINGTON, et al.
Nos. 02-832, 02-833.
Court of Appeal of Louisiana, Third Circuit.
April 17, 2003.
*883 G. Edward Williams, Jr., F. Douglas Gatz, Jr., Jennifer A. Wells, Preis, Kraft & Roy, Lafayette, LA, for Plaintiff/Appellant, National Union Fire Insurance Company of Louisiana.
Tracy P. Curtis, Perret Doise, APLC, Lafayette, LA, for Defendants/Appellants, Progressive Security Insurance Company Burt Harrington.
J. Minos Simon, Chris P. Villemarette, J. Minos Simon, Ltd., Lafayette, LA, for Plaintiff/Appellant, Mary Electa LeBlanc.
William F. Bologna, Habans, Bologna & Carriere, New Orleans, LA, for Defendant/Appellee, DaimlerChrysler Corporation.
Stephen E. Broyles, Glusman, Broyles & Glusman, LLC, Baton Rouge, LA, for Defendant/Appellant, DaimlerChrysler Insurance Company.
John S. Thibaut, Jr., Thibaut, Thibaut & Vogt, Baton Rouge, LA, for Defendant/Appellee, Royal Insurance Company of America.
Court composed of ULYSSES GENE THIBODEAUX, MICHAEL G. SULLIVAN, and BILLY H. EZELL, Judges.
*884 SULLIVAN, Judge.
This appeal arises out of a vehicle fire which resulted in the total loss of Mary Electa LeBlanc's residence. After a jury trial, judgment was rendered in favor of Mrs. LeBlanc and her homeowner's insurer, National Union Fire Insurance Company of Louisiana (National Union). All parties to the judgment, except one defendant, appeal. For the following reasons, we affirm.

Facts
On November 3, 1996, a 1996 Dodge Neon, owned by Acadiana Dodge, Inc. (Acadiana Dodge) and in the possession and use of Burton Harrington, caught on fire while parked under the carport of Mrs. LeBlanc's home in Lafayette. The fire spread quickly, totally destroying the Neon and Mrs. LeBlanc's home. At the time the fire ignited, Mr. Harrington was seated in the Neon. He escaped from the car without harm and unsuccessfully tried to extinguish the fire with a water hose. Mrs. LeBlanc was not at home when the fire started, but returned home when she learned of the fire.
Mr. Harrington rented a mobile home from Mrs. LeBlanc, which was situated on her property behind her home. He testified that he picked up the Neon at Acadiana Dodge on Friday, November 1, 1996, because his car, which was in the body shop there for repairs, was not ready. According to Mr. Harrington, the Neon stayed parked at Mrs. LeBlanc's until he went out Saturday evening at about 8:00 p.m., when he went to Scandals, a lounge located in Lafayette. Mr. Harrington remained at Scandals until it closed at 2:00 a.m. At that time, he returned to Mrs. LeBlanc's. He testified that he drank three to four beers during the evening.
When he arrived back at Mrs. LeBlanc's, Mr. Harrington parked the Neon under her carport which was his custom. He and Mrs. LeBlanc testified that after an evening out he would often stay in his car and listen to music. Mr. Harrington testified that he did the same the morning of the fire, explaining that he parked the car, turned off the ignition, but then turned the ignition to the auxiliary position to operate the radio. Evidently, he fell asleep as he listened to the music and woke up some time later. He testified that he did not remember anything between 2:15 a.m. when he parked the Neon and 4:06 a.m. when he awoke. He further testified that after being awakened by the cold air, he turned on the ignition to turn on the heater. He explained that he turned the ignition, but the car did not start. He denied that he fell asleep with the engine on and his foot on the accelerator. Mr. Harrington testified that he heard a "pop, pop, pop" sound and saw flames shooting out from under the hood when he tried to start the car. He described the car as a "flame thrower." He turned off the car, exited the driver side door, ran to his mobile home, and called 911. He returned and tried to extinguish the fire with a water hose.
National Union paid Mrs. LeBlanc for the loss of her home, then filed suit to collect what it had paid her from the parties liable for the fire. Mrs. LeBlanc also filed suit for damages which exceeded the coverage provided by National Union's policy. Her suit was consolidated with National Union's suit. Named defendants in the consolidated suits were DaimlerChrysler Corporation (DaimlerChrysler); Acadiana Dodge; Hertz Claims Management Corporation (Hertz); DaimlerChrysler Insurance Company (DaimlerChrysler Ins.), insurer of Acadiana Dodge; Royal Insurance Company of America (Royal), insurer of Acadiana Dodge and alleged insurer of Mr. Harrington, as customer of Acadiana Dodge; Mr. Harrington; and Progressive *885 Security Insurance Company (Progressive), his insurer. Mr. Harrington filed cross-claims against DaimlerChrysler and Royal.
Mr. Harrington and Progressive filed a motion for summary judgment on the issue of their liability which was denied. An application for writs of certiorari on this issue was denied by this court. Daimler-Chrysler Ins. filed a motion for summary judgment, asserting that Acadiana Dodge and Hertz were entitled to summary judgment on the issue of liability. Summary judgment in favor of Hertz was not opposed and was granted. After a hearing, summary judgment was granted in favor of Acadiana Dodge. Royal also filed a motion for summary judgment on the basis that, under the facts of this case, neither its liability policy nor its umbrella policy provided coverage for Acadiana Dodge or Mr. Harrington. The motion was granted by the trial court.
The matter was tried before a jury which found Mr. Harrington solely at fault in causing the fire. The jury also determined that Mr. Harrington rented the Neon from Acadiana Dodge, rather than Acadiana Dodge loaning it to him. It awarded $125,000.00 in general damages and $161,500.00 in special damages. National Union, Mrs. LeBlanc, Mr. Harrington and Progressive, and DaimlerChrysler Ins. filed appeals. We first address assignments of error pertaining to the trial court. Assignments of error pertaining to the jury's actions follow.

Summary Judgment
The trial court's grants of summary judgment in favor of Acadiana Dodge, DaimlerChrysler Ins., and Royal are assigned as error. The denial of summary judgment in favor of Mr. Harrington and Progressive is also assigned as error.
Appellate courts review summary judgments de novo under the same criteria that govern the trial court's consideration of whether a summary judgment is appropriate. Schroeder v. Bd. of Sup'rs of La. State Univ., 591 So.2d 342 (La.1991). The mover is entitled to judgment if the pleadings, depositions, answers to interrogatories and admissions on file, together with supporting affidavits, if any, show there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B).
Acadiana Dodge & DaimlerChrysler Ins.
National Union, Mr. Harrington, and Progressive complain that the trial court should not have granted summary judgment in favor of Acadiana Dodge and DaimlerChrysler Ins. Their opposition is based upon Acadiana Dodge's maintenance of the Neon. The Neon was purchased by Acadiana Dodge from DaimlerChrysler and used exclusively as a rental unit from the time of its purchase until the time of the fire. The owner's manual for the Neon recommended an oil and filter change at 7,500 miles; however, maintenance records reflect that the oil and filter were not changed until the Neon had been driven 8,704 miles. Additionally, Acadiana Dodge was not able to produce all of the rental agreements for the Neon and approximately 522 miles are not documented.
Acadiana Dodge's alleged liability is based upon La.Civ.Code art. 2317.1 which provides:
The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from *886 the application of the doctrine of res ipsa loquitur in an appropriate case.
The claims that Acadiana Dodge's lack of maintenance caused the fire are not supported by evidence. The only theory of liability regarding Acadiana Dodge is that the jury could have concluded that the lack of maintenance caused the fire. It is not supported by any factual or expert evidence. Furthermore, for Acadiana Dodge to be liable under La.Civ.Code art. 2317.1, it had to know, or it should have known, that its maintenance procedures could cause the Neon to catch on fire. Nothing in the record indicates any such knowledge by Acadiana Dodge.
Defendants also argue that Acadiana Dodge had true garde of the Neon and under the evidentiary rule of res ipsa loquitur the jury could have assessed fault to it. Res ipsa loquitur is a rule of circumstantial evidence. It is applicable only when the facts and evidence indicate that the defendant's negligence is the most plausible explanation for the plaintiff's injury. Montgomery v. Opelousas Gen. Hosp., 540 So.2d 312 (La.1989). There was no evidence that Acadiana Dodge's maintenance of the Neon was the most plausible explanation for the fire.
Defendants also argue that, because Acadiana Dodge removed the Neon from Mrs. LeBlanc's home after the fire and it was destroyed some time thereafter, it should be held liable under the spoliation of evidence rule. Spoliation of evidence is the intentional destruction of evidence to deprive the plaintiff of its use. See Kammerer v. Sewerage & Water Bd. of New Orleans, 93-1232 (La.App. 4 Cir. 3/15/94), 633 So.2d 1357, writ denied, 94-0948 (La.7/1/94); 639 So.2d 1163; Williams v. Gen. Motors Corp., 607 So.2d 695 (La.App. 4 Cir.1992). Where suit has not been filed and there is no evidence that a party knew suit would be filed when the evidence was discarded, the theory of spoliation of evidence does not apply. Smith v. Jitney Jungle of Am., 35,100 (La.App. 2 Cir. 12/5/01), 802 So.2d 988, writ denied, 02-0039 (La.3/15/02), 811 So.2d 913. There is no evidence that this rule is applicable to Acadiana Dodge.
We find no error with the trial court's grant of summary judgment in favor of Acadiana Dodge and DaimlerChrysler Ins.

Royal Insurance Company
In its motion for summary judgment, Royal, as insurer of Acadiana Dodge, sought dismissal from the proceedings on the basis that summary judgment had been granted in favor of Acadiana Dodge. As the alleged insurer of Mr. Harrington, Royal asserted that neither its Business Protection Portfolio policy (liability policy) nor its Big Shield Commercial Catastrophe liability policy (umbrella policy) provided coverage to Mr. Harrington.
Having affirmed summary judgment in favor of Acadiana Dodge, we affirm summary judgment in favor of Royal, as insurer of Acadiana Dodge.

Liability Policy
Now, we consider whether summary judgment in favor of Royal, as liability insurer of Mr. Harrington, was proper. The basis of Royal's motion for summary judgment regarding its liability policy is the following provision:

WHO IS AN INSURED
The following are "insureds" for covered "autos"
(1) You for any covered "auto."
(2) Anyone else while using with your permission a covered "auto" you own, hire or borrow except:
....
(d) Your customers, if your business is shown in the Declarations as an *887 "auto" dealership. However, if a customer of yours:
(i) Has no other available insurance (whether primary, excess or contingent), they are an "insured" but only up to the compulsory or financial responsibility law limits where the covered "auto" is principally garaged.
(ii) Has other available insurance (whether primary, excess or contingent) less than the compulsory or financial responsibility law limits where the covered "auto" is principally garaged, they are an "insured" only for the amount by which the compulsory or financial responsibility law limits exceed the limit of their other insurance.
Royal asserts that Mr. Harrington is not an insured under this provision because Acadiana Dodge is identified in the policy as an "auto" dealership and his $20,000.00 liability coverage with Progressive exceeds the $10,000.00 minimum compulsory motor vehicle liability insurance required by La. R.S. 32:861. Opponents to the motion argue that Acadiana Dodge's form of business is identified in the declarations of the Commercial Auto Coverage Part of the liability policy as "Corporation," not "`auto' dealership;" therefore, the exception does not apply. This argument ignores the basic rules of contract interpretation and the terms of the policy itself.
Recently, in Succession of Fannaly v. Lafayette Insurance Co., 01-1144, 01-1343, 01-1355, 01-1360, pp. 3-4 (La.1/15/02), 805 So.2d 1134, 1137-38, the supreme court reviewed the basic rules for insurance policy interpretation, stating:
An insurance policy is an aleatory, nominate contract subject to the general rules of contract interpretation as set forth in our civil code. See LSA-C.C. arts.1912, 1914-15. The extent of coverage under an insurance contract is dependent on the common intent of the insured and insurer. See Ledbetter v. Concord General Corp., 95-0809 (La.01/06/96), 665 So.2d 1166, 1169. Thus, when interpreting an insurance contract, courts must attempt to discern the common intent of the insured and insurer. See LSA-C.C. art.2045.
In ascertaining the common intent of the insured and insurer, courts begin their analysis with a review of the words in the insurance contract. Words in an insurance contract must be ascribed their generally prevailing meaning, unless the words have acquired a technical meaning, in which case the words must be ascribed their technical meaning. See LSA-C.C. art.2047. Moreover, an insurance contract is construed as a whole and each provision in the contract must be interpreted in light of the other provisions. One provision of the contract should not be construed separately at the expense of disregarding other provisions. See LSA-C.C. art.2050; Peterson v. Schimek, 98-1712 (La.03/02/99), 729 So.2d 1024,1029.
When the words of an insurance contract are clear and explicit and lead to no absurd consequences, courts must enforce the contract as written. See LSA-C.C. art.2046.
Royal's policy is a comprehensive policy which provides more than one type of coverage to Acadiana Dodge. The Common Declarations of the policy provide: "These declarations, together with the Common Policy Conditions, Coverage Part Declarations, Coverage Forms and Endorsements, if any, issued to form a part thereof, complete the contract of insurance," and the Garage Part Declarations provide: "These declarations when combined with the common policy declarations, the common policy *888 conditions, coverage form(s) and endorsements, if any, issued to form a part thereof, complete the contract of insurance." Thus, the policy itself requires that it be read as a whole.
In the Common Policy Declarations of Royal's liability policy, Acadiana Dodge is identified as the "Named Insured" and its "Business Description" is "Franchised Dealer." (Emphasis added.) The Commercial Auto Coverage Part of the policy is identified as "Garage Coverage Form," and the following statement appears at the end of the first page of the Garage Coverage Part Declarations:
THESE DECLARATIONS MUST BE COMPLETED BY THE ATTACHMENT OF A SUPPLEMENTARY SCHEDULE.
Three "Garage Coverage PartAuto Dealers Supplementary Schedules" follow the Declarations. (Emphasis added.) Furthermore, Item Seven of the supplementary schedules defines the physical damage coverage provided by the policy as comprehensive and collision coverage for new and used automobiles, demonstrators, and service vehicles. Additionally, there are endorsements to the liability policy entitled "Automobile Dealers Legal Defense Cost Coverage" and "Automobile Dealers Errors and Omissions Insurance." (Emphasis added.) We find no error with the trial court's grant of summary judgment in favor of Royal on its liability policy.
Mrs. LeBlanc cites Hargrove v. Missouri Pacific Railroad Co., 00-0228 (La. App. 3 Cir. 1/10/01), 780 So.2d 454, writ granted, 01-1228 (La.6/29/01), 794 So.2d 804, in opposition to the summary judgment. We note that writs were granted by the supreme court; however, the matter must have been resolved by the parties because there is no reported ruling on the writ by the court. In Hargrove, the liability policy treated the defendant's auto dealership and garage operations as two separate businesses. The policy had separate insuring statements and agreements and provided different limits of liability for the auto dealership and the garage operations. That is not the case here: Royal's policy provides the same coverage and limits for Acadiana Dodge's garage operations as its auto dealership operations.
Royal's liability policy identifies Acadiana Dodge as an "auto" dealership. The trial court did not error in granting summary judgment in favor of Royal on its liability policy.

Umbrella Policy
With regard to its umbrella policy, Royal asserted in its motion for summary judgment that, under the terms of the policy and the Automobile Dealer/Garage Endorsement thereto, Mr. Harrington was an insured but only to the extent that Mrs. LeBlanc's damages exceeded Acadiana Dodge's "Retained Limit" which is defined by the terms of the policy as $500,000.00. Mr. Harrington and Progressive argue that the trial court committed error in granting summary judgment on the umbrella policy because it made an assessment of damages when it determined that Mrs. LeBlanc's damages would not exceed the policy's Retained Limit of $500,000.00.
The jury awarded Mrs. LeBlanc $286,500.00 in damages, which she has not appealed. Therefore, any error committed by the trial court in determining that her damages would not exceed $500,000.00 was harmless. Greene v. Taylor, 01-1137 (La. App. 3 Cir. 2/27/02), 809 So.2d 1187, writ denied, 02-0975 (La.4/26/02), 814 So.2d 567.

DaimlerChrysler's Expert Witness
Mr. Harrington and Progressive also assign as error the trial court's acceptance of Robert Banta, a career employee *889 with DaimlerChrysler, as an engineering expert. The requirements of expert testimony are set forth in La.Code Evid. art. 702, which states: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In Mistich v. Volkswagen of Germany, Inc., 95-0939, p. 8 (La.1/29/96), 666 So.2d 1073, 1079, the supreme court noted, "[f]ormal education or training in a particular field is not always necessary to qualify as an expert in a particular field. Experience alone is sufficient." On appeal, a trial court's acceptance of a witness as an expert will not be disturbed, unless it is clearly erroneous. Id.
Mr. Banta has an associate's degree in mechanical technology and has held four or five engineering positions with DaimlerChrysler since he began working with the company in 1967. During his thirty-five years at DaimlerChrysler, his work has included the determination of the cause and origins of fires, and he has attended a significant number of seminars concerning vehicle fire investigation and determination of the cause and origin of fires. He teaches vehicle fire investigation to DaimlerChrysler employees and at the Michigan State Police Academy. Although he does not have a degree in engineering, Mr. Banta has been awarded full membership in the Society of Automotive Engineers, which normally requires an engineering degree. Considering Mr. Banta's extensive experience, training, and continuing education, we find no error with the trial court's acceptance of him as an expert.
Harrington and Progressive also argue that Mr. Banta should not have been allowed to present his theory of how the fire originated to the jury because it was speculative. Their arguments reveal that the real basis for this contention is the fact that Mr. Banta's opinion did not accept Mr. Harrington's testimony regarding his actions in the car before the fire. Specifically, he rejected Mr. Harrington's testimony that the Neon was off while he was sleeping and that there were no flames under the hood until he started the car after waking.
It was the jury's function to consider the testimony of Mr. Harrington and Mr. Banta in light of the evidence presented during the trial, to determine the credibility of each, and to decide the case in light of its credibility determinations and the other evidence. Mr. Banta explained the differences between his theory of the fire and Plaintiffs' expert's theory of the fire and the physical evidence that led him to his determination that Mr. Harrington had not turned off the ignition of the Neon before falling asleep. We find no merit in this assignment of error.

Jury Challenges
Mr. Harrington and Progressive next assign as error the trial court's refusal to treat them as adverse to DaimlerChrysler for the purpose of jury challenges. They assert that their position is adverse to Mrs. LeBlanc and to DaimlerChrysler and that they should not have had to share jury challenges with DaimlerChrysler.
La.Code Civ.P. art. 1764 provides in pertinent part:
B. If trial is by a jury of twelve, each side is allowed six peremptory challenges. If there is more than one party on any side, the court may allow each side additional peremptory challenges, not to exceed four.
C. Each side shall be allowed an equal number of peremptory challenges. If the parties on a side are unable to *890 agree upon the allocation of peremptory challenges among themselves, the allocation shall be determined by the court before the examination on the voir dire.
In Abadie v. Metropolitan Life Insurance Co., 00-344 to 00-856, p. 26 (La.App. 5 Cir. 3/28/01), 784 So.2d 46, 69, writs denied, 01-1533, 01-1534, 01-1543, 01-1544, 01-1629, 01-1853, 01-1931, 01-1953 (La.12/14/01), 804 So.2d 642, 643, 644, 645, the court observed:
For purposes of [La.Code Civ.P. art. 1764], the number of sides in a lawsuit is determined by the legal posture of the parties. Smith v. State Farm Ins. Co., 446 So.2d 1269 (La.App. 4th Cir.1984), writ denied, 449 So.2d 1356 (La.1984). For the purposes of exercising peremptory challenges, multiple party defendants with adverse interests may constitute a single side. Id. The trial court's determination of the number of sides in a lawsuit is subject to the manifest error standard of review. See Atkinson v. Celotex, 93-924 (La.App. 3rd Cir.3/2/94), 633 So.2d 383.
The trial court required Mr. Harrington and Progressive, DaimlerChrysler, and DaimlerChrysler Ins. to share the six peremptory challenges allowed by La.Code Civ.P. art. 1764(B), allowing each defendant two peremptory challenges. We find no manifest error with the trial court's determination on this issue.
Mr. Harrington and Progressive used only one of their two peremptory challenges during jury selection, so they were not prejudiced by the trial court's allocation of peremptory challenges. Therefore, even if the trial court's allocation of the challenges was error, it was harmless. Greene, 809 So.2d 1187.
For the selection of an alternate juror, the trial court limited all of the Defendants to one collective peremptory challenge. The problem at issue arose when DaimlerChrysler wanted to dismiss one juror that Mr. Harrington and Progressive wanted to retain. The trial court allowed DaimlerChrysler to exercise the one peremptory challenge over the objection of Progressive and Mr. Harrington. The alternate juror was not needed for deliberations and was dismissed by the trial court when the jury retired to deliberate. Again, Progressive and Mr. Harrington were not prejudiced by the trial court's allocation of the peremptory challenge. Therefore, if the trial court's requiring the Defendants to use one peremptory challenge for the selection of an alternate juror was error, it was harmless error. Id. This assignment has no merit.

Res Ipsa Loquitur
Mr. Harrington, Progressive, and DaimlerChrysler Ins. assign as error the trial court's application of the doctrine of res ipsa loquitur to this case, arguing that the doctrine can only be applied when the plaintiff is attempting to establish the liability of one defendant.
Generally, a plaintiff's burden of proof in a civil suit is preponderance of the evidence. The plaintiff can meet this burden of proof with direct or circumstantial evidence. Sonnier v. Bayou State Mobile Homes, Inc., 96-1458 (La.App. 3 Cir. 4/2/97); 692 So.2d 698, writ denied, 97-1575 (La.10/3/97), 701 So.2d 201. Circumstantial evidence is "evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be inferred." W. PAGE KEETON, ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 39, at 242 (5th ed.1984). When direct evidence of a defendant's negligence is not available, the doctrine of res ipsa loquitur assists the plaintiff in presenting a prima facie case of negligence. Cangelosi v. Our Lady of the Lake Reg'l Med. Ctr., *891 564 So.2d 654 (La.1989). If applicable, the doctrine allows, but does not require, the trier of fact to infer negligence from the circumstances of the event. Id. Generally, three criteria must be present for the doctrine to be applicable: 1) the facts must indicate that the plaintiff's injuries would not have occurred in the absence of negligence; 2) the plaintiff must establish that the defendant's negligence falls within his scope of duty to plaintiff; and 3) the evidence should sufficiently exclude inference of the plaintiff's own responsibility or the responsibility of others besides defendant in causing the accident. Id. The second factor is often established by showing that the defendant had exclusive control of the injury-causing instrumentality. Id.
Res ipsa loquitor has been applied in cases with multiple defendants. See Hamiter v. Duncan, 78 So.2d 80 (La.App. 2 Cir.1955); Watkins v. Gulf Ref. Co., 206 La. 942, 20 So.2d 273 (1944); Am. Sec. Ins. Co. v. Griffith's Air Conditioning, 317 So.2d 256 (La.App. 3 Cir.), writs denied, 320 So.2d 915, 916 (La.1975); Moak v. Link-Belt Co., 229 So.2d 395 (La.App. 4 Cir.1969), rev'd on other grounds, 257 La. 281, 242 So.2d 515 (1970); Arrington v. Hearin Tank Lines, Inc., 80 So.2d 167 (La.App. 2 Cir.1955). The doctrine is often applied in medical malpractice cases where there are multiple defendants. See McCann v. Baton Rouge Gen. Hosp., 276 So.2d 259 (La.1973); Boudoin v. Crawford & Marshall, Ltd., 97-224 (La.App. 5 Cir. 1/14/98), 709 So.2d 798; Johnston v. Southwest La. Ass'n, 96-1457 (La.App. 3 Cir. 4/2/97), 693 So.2d 1195; Goodliffe v. Parish Anesthesia Assoc., 95-357 (La.App. 5 Cir. 10/18/95), 663 So.2d 769, writ denied, 95-2780 (La.2/16/96), 667 So.2d 1051; Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713 (La.1986); Holliday v. Peden, 359 So.2d 640 (La.App. 1 Cir.1978); Meyer v. St. Paul-Mercury Indem. Co. of St. Paul, Minn., 61 So.2d 901 (La.App. Orl.1952).
Louisiana courts have not refused to apply the doctrine simply because there was more than one defendant. Rather, courts have refused to apply the doctrine where a possible tortfeasor was not joined. See Arrington, 80 So.2d 167; Winans v. Rockwell Int'l Corp., 705 F.2d 1449 (5th Cir.1983). In Moak, 229 So.2d 395, res ipsa loquitur was applied to a situation where an explosion occurred in a sugar factory. The factory owner and a contractor which installed some new mechanical equipment in the factory were sued for damages which resulted from the explosion. The defendants argued that res ipsa loquitur is not applicable where one or the other defendant, or both, could be found liable for the explosion. Upholding the application of res ipsa loquitur, the court of appeal pointed out that the factory owner had
full control of the conveyor system which somehow caused the explosion, at the moment of the explosion, and [the other defendant] had had full control during refabrication and its responsibility for its prior full control was not extinguished by the period of nonuse prior to the disastrous first full use of the system by American.
Id. at 410. The situation here is very similar. Mr. Harrington had full control of the Neon at the time of the fire and DaimlerChrysler had full control of the Neon when it was manufactured and its responsibility for any manufacturing defect which may have caused the fire was not extinguished by Acadiana Dodge's possession and use of it.
In Arrington, 80 So.2d at 170, one of two defendants challenged the application of res ipsa loquitur on the basis that the "plaintiff's failure to allege the exclusive management and control was in a single *892 defendant and where there is such divided responsibility the doctrine of res ipsa loquitur is inapplicable." The court found there was no authority "which denies application of the doctrine of res ipsa loquitur where the operations producing the damage complained of were activities and operations conducted solely by several defendants." Id. The court further observed:
The presumption of negligence arising from the mere happening of the accident does not attach, therefore, to one who from reference to plaintiff's petition or the evidence adduced upon trial, is not shown to be in control of the operations which produced the injury. This is especially true where there is but one defendant. But it does not follow there cannot be more than one defendant who may be required to rebut an inference of negligence which may be the proximate cause of the damage.

Id. (emphasis added).
Two theories of the Neon fire emerged from the facts, the physical evidence, and the opinions of the experts. Under these theories, DaimlerChrysler and Mr. Harrington were the only possible tortfeasors and they were before the jury for trial of this matter. The only other alleged possible tortfeasor was Acadiana Dodge, which, as previously discussed, was dismissed on summary judgment.
We find no error with the application of res ipsa loquitur under the facts of this case.

Assessment of Fault
All parties, except DaimlerChrysler, assign as error the jury's failure to assess fault to DaimlerChrysler. Two theories of the cause and origin of the fire were presented to the jury. Plaintiffs' theory of the fire was presented by their expert, George Casellas, an electrical engineer. Mr. Casellas testified that he believed the fire was an electrical fire caused by a mis-routed wiring harness that came into contact with an exhaust recirculation tube. DaimlerChrysler's expert, Robert Banta, theorized that when Mr. Harrington fell asleep in the Neon, the engine was running and that, at some point during his sleep, he put his foot on the accelerator, causing it to run at full throttle, and that this, along with the car being stationary, caused the car to catch on fire.
The fire was investigated by the Lafayette Fire Department and an investigator retained by National Union. Mr. Terrance Gahn, fire investigator for the Lafayette Fire Department, testified that he arrived at the scene of the fire one or two hours after it was out. He placed the origin of the fire at the Neon under the carport. He testified that he did not know whether the fire started inside or outside of the vehicle. He had no opinion as to how the fire started.
National Union retained Mervin Stringer, an accident investigator, to investigate the fire. Mr. Stringer conducted his investigation on November 11, 1996. He testified that he could not find any definitive physical evidence of the point of origin of the fire and that he could only narrow it down to some place between the front bumper and the front seat of the car. When he conducted his investigation, the car had been removed from the carport. There was no oil or residue on the floor of the carport, and he testified that this indicated to him that engine failure had not caused the fire. He also testified that he could not rule out that some action by Mr. Harrington may have caused the fire.
Mr. Casellas' theory was based upon the recall of Neons manufactured at a DaimlerChrysler plant in Mexico because of a mis-routed wiring harness. The Neon in this case was manufactured in Illinois.
*893 However, Mr. Casellas testified that he had investigated another fire in a Neon, which was manufactured in Illinois, that he also attributed to a mis-routed wiring harness. He theorized that the mis-routed wiring harness came into contact with the exhaust gas recirculating tube, which reaches temperatures of 400 to 500, causing the wire harness's insulation protection sheath to melt. As a result, he believed there was a failure of the engine control module which caught on fire. He thought the popping noise described by Mr. Harrington was the clicking sound that occurs when the ignition is turned on and the battery has been drained of power by an electrical short.
Mr. Casellas explained that he considered the fire patterns shown in photographs of the vehicle, the consumption of components in the engine, and the heat in the area of the engine to rule out other factors that could have caused the fire. In his opinion, an inherent defect in the Neon caused the fire. Further, he explained that he knew the fire came from under the hood in the general area of the harness and that he concluded by the process of elimination that the fire was electrical in nature. He also testified that he ruled out a fuel leak as the cause of the fire because, according to Mr. Harrington's testimony, the engine was not running at the time the fire started. Continuing, he explained that the only way an engine can catch on fire from running at high speed would be if there was a total breakdown of the engine, i.e., throw a rod or have a cracked engine block. He testified that he knew that did not happen because a photograph of the dipstick taken by Mr. Stringer showed that there was plenty of oil, which would not have been the case if a rod had been thrown.
On cross-examination, Mr. Casellas agreed that, if Mr. Harrington forgot, made a mistake, or was sleeping soundly and did not remember that the Neon was running when he awoke, there was no basis for his opinion. Further, he testified that if an engine is running very hot maybe for a couple of hours while someone sleeps with his foot on the accelerator, and fluid leaks on the manifolda fire could start. Finally, he testified that he could not rule out that some action of Mr. Harrington may have led to the fire.
In explaining his theory to the jury, Mr. Banta testified that testing has established that a stationary vehicle running at full throttle will catch on fire within a period of fifteen to twenty minutes; occasionally, one may go for up to an hour before catching on fire. He also testified that only one to one and one-half pound of pressure is required to completely depress an automobile accelerator and that a human's leg weighs thirty to forty pounds. Further, he testified that he has investigated fires that occurred under similar circumstances.
According to Mr. Banta, Mr. Harrington's testimony that, when he woke up and turned on the ignition, he heard an explosion and a popping noise, like gunfire, and saw flames eighteen to twenty-four inches high coming out from under both sides of the hood of the Neon, and that the flames got higher when he turned off the ignition, supports his theory. He explained that the fire described by Mr. Harrington was a "mature" fire, not a beginning fire, as he would expect if the fire had been caused by a short circuit when Mr. Harrington turned the key in the ignition. Mr. Banta further explained that a fire caused by a short circuit in electrical wiring begins as a small fire and in his opinion would not have grown to the size described by Mr. Harrington in such a short time. He did admit, however, that if an electrical fire had started during the time that Mr. *894 Harrington was sleeping, it could have accelerated into a larger fire.
Mr. Banta refuted Mr. Casellas' opinion that this fire was not a fuel fire because there was no oil on the dipstick in a picture taken by Mr. Stringer, explaining that oil on the dipstick was not significant here because coolant can be added to engine oil when there is a failure of the cooling system. He testified further that the Neon is a front-wheel-drive car which has transmission fluid and differential fluid in the same device and that, if there was a failure of the cooling system, transmission fluid would get into the cooling system, causing the temperature to increase. He then pointed out a photograph taken by Mr. Stringer which showed that the transaxle dipstick was dry, even though his report indicated that there was fluid in the transaxle. According to Mr. Banta, this proved that Mr. Casellas' explanation regarding the invalidity of his theory that the Neon caught on fire because the engine overheated was wrong. He also testified that it does not take a complete loss of engine oil for a vehicle to overheat and catch on fire.
In Mr. Banta's opinion, Mr. Harrington's description of the fire was conclusive evidence that the engine was running at high speed at the time of the fire, explaining that the noises Mr. Harrington heard were probably hoses bursting and fluids making popping sounds as they hit other hot components under the hood. This indicated to him that the fire was caused by Mr. Harrington's improper operation of the engine; in particular, running the engine over speed for some period of time.
Mr. Banta testified at length regarding the recall issued for the Neons with mis-routed harnesses that were manufactured at the Mexico plant, explaining what wires were contained in the harness and the voltage of the wires. He testified that the wires within the harness did not possess enough energy to actually start a fire and that when the wiring fails the computer becomes confused because it does not receive the correct information, causing the engine to stall or die. Further, he testified that only two fires were reported as resulting from this problem: this fire and the other case discussed by Mr. Casellas, which was also being handled by Mrs. LeBlanc's attorney. Using photographs taken by Mr. Casellas, Mr. Banta identified the wiring harness and testified that the harness was correctly routed, explaining that what Mr. Casellas had identified in the photograph, as the wiring harness, was actually the starter cable. Mr. Banta was questioned extensively on cross-examination regarding his opinion, the recall of the Neons manufactured in Mexico, and his rejection of Mr. Casellas' opinion.
The manifest error standard is applicable to our review of this matter. Under this standard, when the inferences drawn by the trier of fact from the record are reasonable, those inferences will not be set aside on appeal. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). Here, the jury heard Mr. Harrington's testimony, the testimony of the two persons who investigated the fire, the extensive testimony of the experts in support of their theories and rejecting the opposing theories. We find the jury's conclusion reasonable.
Therefore, there is no need to address Mr. Harrington's and Progressive's assignment of error that the trial court erred in denying summary judgment in their favor on the issue of liability.

Loaner versus Rental
National Union, Mrs. LeBlanc, Mr. Harrington, and Progressive assign as error the jury's finding that the Neon was rented, not loaned, to Mr. Harrington. National *895 Union, Mr. Harrington, and Progressive also assign as error the trial court's failure to find, as a matter of law, that the Dodge Neon was loaned to Mr. Harrington.
When Mr. Harrington picked up the Neon at Acadiana Dodge, he was presented with a document entitled "Rental Agreement." The agreement identifies the Neon, the daily rental rate of $25.00, the three-day rental, and the $75.00 total for the rental. Mr. Harrington signed the agreement in the designated space which states: "THIS IS YOUR INVOICEPAYMENT DUE ON RECEIPT," and he paid the rental charges when he paid for the repairs to his car. He testified that he did not rent the car and explained that he was instructed to sign the agreement to indicate his rejection of insurance on the car during his use of it.
Article 2670 of the Louisiana Civil Code provides that there are three essential elements to a lease: a thing, a price, and consent. The rental agreement evidences all of these elements. Furthermore, a "signature is not a mere ornament. One is presumed to know what he or she has signed." See Thibodeaux v. Am. Land & Exploration, Inc., 450 So.2d 990 (La. App. 3 Cir.), writ denied, 458 So.2d 118 (La.1984). The burden of proof is on the person denying knowledge of the document to establish that they were deceived. Id. Mr. Harrington's signature on the agreement evidences his consent to the terms of the agreement, unless he establishes that he was deceived. The jury did not accept his explanation regarding why he signed the rental agreement. Considering the contents of the rental agreement and the fact that Mr. Harrington paid the rental charges, we find the evidence sufficient for the jury to conclude that the Neon was rented, not loaned, to Mr. Harrington by Acadiana Dodge. This assignment is without merit.

Damages
Harrington, Progressive, and Daimler-Chrysler Ins. assign as error the jury's damage awards, complaining that general damages should not have been awarded and that the property damage award should have been reduced for depreciation.

General Damages
The jury awarded Mrs. LeBlanc $125,000.00 in general damages. Defendants assert that the award was improper because she was not endangered by the fire and she chose to go to her home when she knew it was burning.
We find no merit in Defendants' argument that Mrs. LeBlanc is not entitled to damages for mental anguish because she chose to return to her home when she knew it was burning, finding she reacted no differently than anyone else in her situation would have.
At the time of the fire, Mrs. LeBlanc was a sixty-nine-year-old widow. Even though she had diabetes and suffered with osteoarthritis and osteoporosis, she worked as a sitter with elderly, terminally ill patients. Mrs. LeBlanc described for the jury what she felt when she saw her home on fire:
[I]t was still in flames. [I][f]elt numb all over. Thought [I was] going to drop dead right there. I got very clammy and weak and faint. And then I asked my sister and her husband if they would take me home. I was afraid I was going to go into a diabetic coma. I started quivering on the inside which is what usually happens before a coma comes on.
She testified further that she can no longer control her diabetes as she had before the fire.
*896 Mrs. LeBlanc described for the jury her life in her home, explaining that two of her four children lived away and that her family gathered at her home for special occasions and holidays. She testified how much she enjoyed preparing their favorite meals and sharing those times with them and how special her memories of those occasions are to her. She also described the extreme personal loss that she felt and the inconvenience she endured upon the loss of her home.
Three months before the fire, Mrs. Le-Blanc had made certain improvements to her home, preparing it for her later years. She installed a hot tub with a trapeze lift over it to allow her to relieve the pain she suffered from her osteoarthritis and osteoporosis. She changed flooring and siding. She installed handrails in various places and had the doors modified to maintain her accessibility to her entire home, even if she became disabled.
After the fire, she had to move into an apartment. She fell as she descended a stairwell when a fire alarm was sounded, fracturing several bones. She had to attend physical therapy for ten months as a result of her injuries. Thereafter, she moved to another apartment where she lived for some time before moving to the apartment she lived in at the time of the trial. She described how living in an apartment was nothing like living in her home. She no longer had her hot tub, handrails, or other items that she had had installed to make her life easier. More importantly, she no longer had a home where her family could gather to visit and celebrate special occasions.
"As a general rule, if a defendant's conduct is merely negligent and causes only mental disturbance, absent accompanying physical injury, then the defendant is not liable for that emotional disturbance." Johnson v. First Nat'l Bank of Shreveport, 00-870, p. 20 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, 50, writs denied, 01-2770, 01-2783 (La.1/4/02), 805 So.2d 212, 213. However, a mental anguish victim who watches his property as it is destroyed is not required to show that he suffered a simultaneous physical injury when the victim's property is damaged.
Mental anguish occasioned by damage to property also is compensable if the mental anguish victim was present or nearby and suffered psychic trauma as a direct result of watching the destruction of his or her property.... Although the plaintiff does not suffer contemporaneous personal injury or property damage, he or she nevertheless may recover for negligently inflicted emotional distress if the defendant's conduct placed the plaintiff in fear or concern for his or her safety.... [In] Louisiana ... an award is proper when the conduct is directed at the mental anguish victim and the circumstances show an "especial likelihood of genuine and serious mental distress." Cases in which a plaintiff fears for his personal safety or in which he watches his property destroyed probably are the most common....
FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW § 5-8, at 124-125 (1996).
Mrs. LeBlanc's home, all of her physical and personal possessions, and, more importantly, her way of life were destroyed. Additionally, her diabetic condition has worsened. We find no error with the jury's award of general damages.

Property Damages
Defendants complain that the jury's award for the loss of Mrs. LeBlanc's property is excessive because it did not factor in depreciation. Charles Cummings, an appraiser, valued Mrs. Le-Blanc's property at $178,000.00. Defendants *897 did not present any evidence on the value of the property. The jury awarded her $161,000.00.
The general rule of damages ... for valuation of tortiously damaged property without market value is the actual or intrinsic value of the property to the owner. While this is certainly a realistic and praiseworthy rule, it is not of much practical use for ascertaining a dollar amount. However, certain factors could be relevant to determine whether the rule is met by a particular award, including, but not limited to, the true nature of the loss; the costs of producing or acquiring the property in terms of reasonably spent time, effort and money; the present and potential future use of the item had it not been destroyed; and the cost and practicability of restoration.
Emerson v. Empire Fire & Marine Ins. Co., 393 So.2d 691, 693 (La.1981) (emphasis added) (footnote omitted). In Emerson, the issue was the appropriate award for the loss of research records which had no market value at all.
In Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874 (La.1993), the court noted that reasons personal to an owner are often the basis of a property damage award, which exceeds the property's value before it was damaged. In the Archdiocese case, the supreme court observed that the goals of our Civil Code and the Louisiana Constitution are to "compensate the victim to the full extent of his loss and restore him to as good a position as he held prior to the damage." Id. at 879.
Mrs. LeBlanc cannot be restored to the position she was in before her home was destroyed. Monetarily, most of her property had depreciated. However, for her the value of her personal items appreciated more and more as time progressed. Such items like family photographs, her family Bible, the rosary she received when she made her First Communion, a teacup collection, items her husband had given her or built for her, are irreplaceable.
Under these circumstances, we find no error with the jury's award of damages for Mrs. LeBlanc's lost property.

Peremptory Exception of No Cause of Action
DaimlerChrysler Ins. filed an exception of no cause of action after this appeal was lodged. According to the allegations of the motion, Progressive Ins. and Mrs. Le-Blanc entered into a settlement and satisfaction of judgment, pursuant to which Mrs. LeBlanc granted subrogation rights to Progressive in connection with the settlement. Mrs. LeBlanc opposed the exception alleging that she is entitled to recover additional sums from Progressive. The settlement documents are not before this court. Therefore, this matter is remanded to the trial court for determination of any additional rights Mrs. LeBlanc may have in light of the settlement.

Decree
The judgment of the trial court is affirmed. This matter is remanded to the trial court for determination of any additional rights Mrs. LeBlanc may have in light of her settlement with Progressive Security Insurance Company. All costs of this appeal are assessed to Burton Harrington and Progressive Security Insurance Company and DaimlerChrysler Insurance Company.
AFFIRMED AND REMANDED WITH INSTRUCTIONS.