# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 06-646
### consolidated with 06-647

## COCKRELL OIL & GAS CORPORATION

## VERSUS

## JACK CALDWELL

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT,
PARISH OF IBERIA, NO. 96503,
HONORABLE KEITH R. J. COMEAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

## MICHAEL G. SULLIVAN
## JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Michael G. Sullivan, Elizabeth A. Pickett, and Billy Howard Ezell, Judges.

### AMENDED AND AFFIRMED AS AMENDED.

David M. Culpepper
Attorney at Law
400 Poydras Street, Suite 1710
New Orleans, Louisiana 70130
(504) 525-8111
Counsel for Plaintiff/Appellant:
    Cockrell Oil & Gas Corporation

James R. McClelland
Post Office Box 592
Franklin, Louisiana 70538
(337) 828-1880
Counsel for Plaintiff/Appellant:
    Cockrell Oil & Gas Corporation

**Vivian B. Guillory**
**Attorney at Law**
**Post Office Box 44033**
**Baton Rouge, Louisiana 70804**
**(225) 342-1800**
**Counsel for Defendant/Appellee:**
    **Oyster Lease Damage EvaluationBoard**

**Brandon J. Taylor**
**Philip F. Cossich**
**Cossich, Sumich, & Parsiola**
**Post Office Box 400**
**Belle Chasse, Louisiana 70037**
**(504) 394-9000**
**Counsel for Secondary Defendant/Appellant:**
    **Van Robin**
    **Clear Water Oysters, Inc.**

SULLIVAN, Judge.

Cockrell Oil Corporation appeals an award of damages to Van Robin and Clear Water Oysters, Inc. by the Oyster Lease Damage Evaluation Board. Van Robin and Clear Water Oysters, Inc. appeal the Oyster Lease Damage Evaluation Board's failure to award interest on its damage award. For the following reasons, we amend and affirm as amended.

## *Facts*

In June 2000, pursuant to the rules and regulations promulgated by the Oyster Lease Damage Evaluation Board (the Board), Cockrell Oil Corporation (Cockrell) requested an arbitration before the Board to establish any potential damage to oyster leases at and/or adjacent to the site of drilling activities it was preparing to begin in the Gulf of Mexico. In connection therewith, Cockrell had Oyster Lease 29122, which is owned by Van Robin and Clear Water Oysters, Inc. (Clear Water), surveyed by Maureen M. Mulino, Ph.D. A portion of Lease 29122 is adjacent to Oyster Lease 29148, the lease on which Cockrell's drilling activities were going to be conducted. After a hearing, the Board ordered Cockrell to deposit $20,000 to protect Clear Water's interests. Cockrell deposited that sum with the Board and commenced its drilling operations in October 2000.

Cockrell's drilling operations included the placement of a submersible drilling barge on Lease 29148 by means of tugs which moved the rig onto the location and positioned it on the bottom of the floor of the Gulf of Mexico by flooding ballast tanks. The rig and its accompanying tugs approached the well location from the southeast; the rig was sunk at the well along a southeast-northwest axis. The well location was composed of soft mud.

The drilling rig occupied approximately 0.4 acres in the southeast corner of Lease 29148. The water depth in the area was approximately ten to twelve feet. A storm displaced the rig, necessitating the removal of the rig from its original location, the placement of a 102' x 80' x 3' rock pad at the drill location, and replacement of the rig on the drill site on the pad. Drilling was completed in November 2000. Because the well was a dry hole, it was plugged and abandoned; no further operations were conducted by Cockrell.

Dr. Mulino conducted a post-drilling survey of Lease 29122 in February and March 2001. Noel Brodtmann surveyed Lease 29122 at the request of Clear Water in March 2001. A hearing was then held before the Board to determine what, if any, damages Clear Water's lease actually sustained as a result of Cockrell's drilling activities. The Board concluded that the drilling activities damaged Clear Water's lease and awarded it $174,270. Cockrell filed an appeal with the Secretary of Natural Resources which reversed the Board's decision. In his reversal of the Board's decision, the Secretary stated that the evidence did not establish that Cockrell's drilling activities damaged oysters on Clear Water's lease. Pursuant to procedures established by the Board, Clear Water requested that the Board reverse the Secretary's reversal of its decision. The Board members unanimously voted to reverse the Secretary's decision.

Cockrell and Clear Water then sought judicial review of the Board's decision. The two matters were consolidated by the trial court. After remanding the matter to the Board for written reasons, findings of facts, and conclusions of law, the trial court upheld the actions of the Board and affirmed its decision. The trial court did not

2

address Clear Water's request for legal interest. Cockrell appealed, seeking reversal of the Board's decision; Clear Water appealed, seeking an award of legal interest.

## *Assignments of Error*

Cockrell assigns the following errors:

1) The trial court erred in affirming the Board's Arbitration Decision because the Board's findings of causation were arbitrary, capricious, contrary to law, inherently self-contradictory, and lacking in competent evidentiary support.

2) The trial court erred in affirming the Board's award of damages to Clear Water where the Board's award of damages was contrary to law and unsupported by competent evidence.

3) The trial court erred in affirming the Board's Arbitration Decision because it contravened §§ 955.G and 956.(3) of the Administrative Procedure Act and violated Cockrell's rights to substantive procedural due process by secretly basing its damage award on information never officially noticed and never disclosed to Cockrell until over three years after the final damage determination in favor of Robin and Clearwater.

Clear Water assigns as error the Board and trial court's failure to award interest on the damage award.

## *Standard of Review*

The "manifest error-clearly wrong" standard of review applies to the factual findings of an administrative body. *Alexander v. Pellerin Marble & Granite*, 93-1698 (La. 1/14/94), 630 So.2d 706. Therefore, we cannot set aside the Board's findings of fact, unless we find that they are clearly wrong in light of the entire record. *Id.* To reverse the Board's decision, we must determine that its conclusions were clearly wrong or clearly without evidentiary support. *Benjamin v. Hous. Auth. of New Orleans*, 04-1058 (La. 12/1/04), 893 So.2d 1. This includes expert opinions. The Board's evaluation of expert testimony should not be overturned unless the stated

reasons of the expert are patently unsound. *Zimko v. Amer. Cyanamid*, 03-658 (La.App. 4 Cir. 6/8/05), 905 So.2d 465, *writ denied*, 05-2102 (La. 3/17/06), 925 So.2d 938.

### *Discussion*

#### *Causation*

Cockrell argues that Clear Water failed to carry its burden of proof in establishing that its drilling activities damaged its lease. Clear Water had to prove that Cockrell's drilling activities were a cause-in-fact of damage to its lease. *Lasyone v. Kan. City S. R.R.*, 00-2628 (La. 4/3/01), 786 So.2d 682. Cockrell's drilling activities were a cause-in-fact of Clear Water's alleged damage if they were a "substantial factor" in bringing about the damage. *Dixie Drive It Yourself Sys. New Orleans Co. v. Am. Beverage Co.*, 242 La. 471, 482, 137 So.2d 298, 302 (1962). A party's actions are a substantial factor in causing damage if the damage would not have occurred without it. *Id.* If Clear Water's oysters were damaged irrespective of Cockrell's drilling activities, the drilling was not a cause-in-fact of Clear Water's damages. *Id.* Determination of cause-in-fact is a factual determination to be made by the fact finder. *Bonin v. Ferrellgas, Inc.*, 03-3024 (La. 7/2/04), 877 So.2d 89.

To prevail, Clear Water had to prove that Cockrell's drilling activities damaged its lease by a preponderance of the evidence. Direct or circumstantial evidence can be used to prove such a claim. *Benjamin*, 893 So.2d 1. "Circumstantial evidence is 'evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be inferred.'" *Nat'l Union Fire Ins. Co. of La. v. Harrington*, 02-832, p. 14 (La.App. 3 Cir. 4/17/03), 854 So.2d 880, 890 (quoting W. PAGE KEETON, ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 39, at 242

4

(5th ed. 1984)). Circumstantial evidence must "taken as a whole, exclude every other reasonable hypothesis with a fair amount of certainty." *Benjamin*, 893 So.2d at 5. However, it does not have to "negate all other possible causes." *Id.* If the evidence, both direct and circumstantial, shows that the facts sought to be proved are more probable than not, Clear Water met its burden of proof.

The Board is an administrative agency which was specifically formed to address the types of claims presented herein. It is composed of one member nominated by the Louisiana Oyster Dealers and Growers Association, one member nominated by the Louisiana Oyster Task Force, two members nominated jointly by the Louisiana Independent Oil and Gas Association, Louisiana Mid-Continent Oil and Gas Association and the Louisiana Landowners Association, and an administrative law judge. La.R.S. 56:700.13(B). When evaluating evidence regarding a claim for damage to oyster leases as the result of oil and gas activity, the Board may use its own judgment concerning matters within its area of expertise. *See Dravo Basic Materials Co., Inc.*, 604 So.2d 630 (La.App. 1 Cir. 1992); *Summers v. Sutton*, 428 So.2d 1121 (La.App. 1 Cir. 1983).

Dr. Mulino testified on behalf of Cockrell. Her pre-drilling survey established that the oyster reefs on Clear Water's lease were old, very productive reefs and that there was a large standing crop of oysters at that time. Her post-drilling survey revealed 100% mortality of oysters in the northeast corner of Clear Water's lease which is approximately 800 feet from the drilling site and is adjacent to the area vessels traveled for the placement of the drilling rig. Dr. Mulino related this oyster mortality to an Act of God and not to Cockrell's drilling activities. She testified that her post-drilling survey revealed that approximately 177 acres of Clear Water's lease

5

"were covered to some extent with from one to twelve inches of a material [she] described as a fluid mud or fluff of gel like consistency or yogurt like consistency." This was the first time she had seen this fluff in her twenty-four years of experience. She believed the fluff was the result of a land building process in the Atchafalaya River area which occurs during the winter. This opinion was not based on personal experience but on information obtained from the engineer who assisted her with her post-drilling survey and other persons who research in this field.

Dr. Mulino concluded that if any damage was caused by Cockrell's drilling activities, it was "masked by this large area of fluff." She did not find any physical evidence linking the dead oysters on Clear Water's lease to Cockrell's drilling activities because "the magnitude of the fluff or the gel out there . . . would have had to have come from somewhere and there was no hole from which it came. There was nothing at the well site except black bottom."

On questioning by members of the Board, Dr. Mulino testified that this fluff phenomenon occurs annually during the winter and rarely during the summer. One Board member specifically questioned how the oysters on Clear Water's lease could have grown to the large size she described in her pre-drilling survey, if this phenomenon occurred annually, when it takes several years for oysters to grow to such a size. Dr. Mulino did not have an explanation other than "[m]aybe it doesn't occur in that spot every year. I don't know." She admitted that she did not check to see if other areas adjacent to Clear Water's lease also had this fluff.

On cross-examination, Dr. Mulino questioned the possibility of a vessel moving the quantity of fluff she found on Clear Water's lease, which she calculated to be 95,000 cubic yards of material. However, she admitted that she did not do any

6

investigation concerning the movement and replacement of Cockrell's rig and that she did not know if there was a difference in the mud that occurred naturally near the drill site and the fluff that she found on Clear Water's lease. On further questioning, she testified that the mud at the drilling site was very soft and that it is "very possible" that the material she found on Clear Water's lease was the same material at the drilling site. Furthermore, she noted in her written report that "the bottom sediments at the well site were similar to the mud samples taken from the reef."

Cockrell acknowledged in its proposed findings of fact that the water bottom in the area of the drilling rig was "soft mud bottom" and that the vessel traffic required to initially place it traveled over that soft mud bottom to place and sink the rig. Furthermore, when the rig was displaced by bad weather, additional vessel traffic over this soft mud bottom was required to move the rig, sink the limestone pad, then replace the rig on the pad. It took a week to two weeks to get the drill rig back on line for drilling because of the storm that displaced it; however, the entire time was not actually spent moving the rig back in place.

Mr. Brodtmann testified on Clear Water's behalf regarding causation, the value of the lost oysters, and the cost of repairing Clear Water's reefs to allow for new oyster growth. He opined that 37.8 acres of Clear Water's 1000 acre lease were damaged by Cockrell's drilling activities. His post-drilling damage survey revealed "a lot of mortality . . . lot of blackened shell in the northeast corner of Clear Water's lease which is south of where the drilling activities occurred on Lease 29148." In his opinion, the damage to Lease 29122 was directly caused by Cockrell's drilling activities: "[I]t is pretty straightforward. If you look at the drilling location, if you look at the oyster mortality location, if you look at the oyster mortalities found in

7

areas well away from the drilling location on the same reef, it is readily apparent." This opinion was called into question when a Board member noted that Mr. Brodtmann's plottings of oyster mortality were not clearly indicative of greater mortality closer to the drill site with mortality declining at greater distances from the drill site. In response, Mr. Brodtmann explained that there was spat (new oyster growth) at some of these locations which indicated mortality then revitalization of the oysters.

On cross-examination, Mr. Brodtmann admitted that he did not know the draft of the rig used to drill Cockrell's well and explained the basis of his opinion as "twenty-one years of experience and that this area gets very rough. It had to be a sizeable drilling rig." Mr. Brodtmann was also questioned regarding the tug boats used to place the rig and again admitted that he did not know the draft of the tugs; however, he explained that he knew large vessels were required at the drilling site because the area becomes extremely rough. He also testified that he saw large vessels in the area when he surveyed the lease in March 2001. He admitted that the vessels he saw were not vessels contracted by Cockrell but opined that the vessels he saw at that time were indicative of the vessels needed to conduct operations in that area.

Mr. Brodtmann found Dr. Mulino's fluff theory "very difficult to believe" because it did not "fit with the facts." He questioned the fact that the fluff was found only in the vicinity of Cockrell's drilling activities, explaining that he pulled samples from Lease 29148 and visually inspected another area not far from Clear Water's lease and did not find any evidence of fluff on these adjacent areas. Additionally, he indicated that Dr. Mulino's calculation of 95,000 cubic yards of soil having been

8

deposited on Lease 21922 was inaccurate, testifying that when settled mud is fluidized its bulk can be ten times the volume of the settled mud.

We have examined the entire record carefully. The transcript makes it clear that the Board seriously considered the evidence. In doing so, it accepted and rejected portions of each expert witness's testimony. Questions and comments by members of the Board established that they were knowledgeable and experienced regarding the different aspects of this claim and were aware of conflicts in the evidence. The Board utilized the knowledge and experience of its Board members to assist it in making its determinations as expected and anticipated by the legislation which created it.

Cockrell argues that the Board required that it "prove that its drilling activities were not the cause of the oyster mortalities" on Clear Water's lease and points to the Board's rejection of the Secretary's reversal of its decision in support of this argument. The Board's statement is written in a manner that might cause one to believe that it placed the burden of proof on Cockrell; however, the evidence supports the Board's determination that Clear Water established that Cockrell's drilling was a substantial factor in causing damage to its oysters. We find no manifest error with the Board's finding that Cockrell's drilling activities damaged Clear Water's lease.

***Damages***

Cockrell urges that the trial court erred in affirming the Board's award of damages to Clear Water. Clear Water presented the testimony of Mr. Brodtmann on the issue of damages. Mr. Brodtmann calculated Clear Water's damages as being $348,854 net loss and $186,462 for material to restore the reproductive capacity of the lease. His opinion was based in part on Dr. Mulino's pre-drilling survey, as he

9

found her calculations of the standing crop of live oysters on Clear Water's lease prior to Cockrell's drilling activities, credible. Cockrell did not present any evidence on the issue of damages, other than Dr. Mulino's testimony that if Cockrell's operation caused any damage to Clear Water's lease those damages were was masked by fluff.

The Board was careful in its consideration of the evidence of damage to oysters on Clear Water's lease and Mr. Brodtmann's calculation of Clear Water's damages and awarded much less than Clear Water sought to recover. It was aware of the fact that Clear Water had not harvested oysters on this lease for some time preceding Cockrell's operations. We find no abuse in the Board's award. We also find no merit in Cockrell's arguments that the Board violated its own rules and denied Cockrell due process in awarding damages to Clear Water because, finding the Board adjudicated this claim in the manner prescribed by La.R.S. 43:3701-3923, La.R.S. 56:700.10-700.14, and the rules and regulations promulgated by the Board.

### Clear Water

#### Legal Interest

Clear Water urges that the Board and trial court erred in not awarding legal interest on its award. Board Rule 43.I.3909(A) provides in part:

> If the award exceeds the amount of the deposit the board . . . *shall* order the owner to pay the leaseholder the amount of the difference between the award and the deposit together with legal interest thereon from the date of the initial deposit.

"The word 'shall' is mandatory." La.R.S. 1:3. Therefore, the interest provided for in this rule "automatically attaches until judgment is satisfied, whether prayed for in petition or mentioned in judgment." *George v. Guillory*, 00-591 (La.App. 3 Cir. 11/2/00), 776 So.2d 1200, 1211. *See also Bourque v. Allstate Ins. Co.*, 99-1260

10

(La.App. 3 Cir. 3/22/00), 760 So.2d 411; *La. Power & Light Co. v. Parish Sch. Bd. of Parish of St. Charles*, 93-249 (La.App. 5 Cir. 2/11/94), *writ denied*, 94-604 (La. 4/22/94), 640 So.2d 1317.  Clear Water is entitled legal interest on the difference between its award and Cockrell's deposit from the date Cockrell deposited $20,000 with the Board until paid.

### *Disposition*

The Board's determination that Cockrell's drilling operations in October 2000 damaged Clear Water's oyster lease and its award of $174,270 as compensation for that damage are affirmed.  Clear Water is entitled to legal interest on the award from July 26, 2000 until paid.  Costs of this appeal are assessed to Cockrell Oil & Gas Corporation.

**AMENDED AND AFFIRMED AS AMENDED.**